FILED
2022 Oct-25  PM 04:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SANDRA MOSS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cv-131-GMB |
| | ) | |
| ST. VINCENT'S HEALTH | ) | |
| SYSTEM, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Sandra Moss filed a complaint against her former employer, St. Vincent's Health System, alleging discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(m), and 42 U.S.C. § 1981. Doc. 1 at 5–9. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 10. Before the court is St. Vincent's Motion for Summary Judgment. Doc. 27. The motion has been fully briefed (Docs. 28, 43, 46, 46, 49 & 51) and is ripe for decision. For the following reasons, St. Vincent's motion is due to be granted.

### I.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The purpose of summary judgment is to

separate real, genuine issues from those which are formal or pretended." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted). The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Ed. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). On the other hand, if the nonmovant "fails to adduce evidence which would be sufficient . . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## II. FACTUAL BACKGROUND

St. Vincent's hired Moss, a black woman, as a Telemetry Technician[1] in November 2008.[2] Doc 18-1 at 10. Telemetry techs monitor and read patients'

---

[1] The record uses the terms "telemetry technician," "telemetry tech," and "monitor tech" interchangeably. All describe the same position. Doc. 18-2 at 5.

[2] Before working at St. Vincent's, Moss worked as a telemetry tech at Carraway Hospital for about 20 years. Doc. 18-1 at 10.

cardiac rhythms on telemetry monitoring devices. Doc 18-1 at 11, 83.   More specifically, they document patients' heart rates, oxygen levels, and cardiac rhythm changes and report any cardiac irregularities to the nurses. Doc. 18-1 at 11; Doc. 18-2 at 14.   Telemetry techs also report patients who remove their monitors for any reason. Doc. 18-1 at 11, 40.

Telemetry techs work alongside the telemetry technician team leads.[3] Doc 18-2 at 14.   The leads ensure monitor rooms are properly equipped, report any safety issues to the nurse manager, track missing and returned monitors, and deliver monitoring strips and batteries to patient rooms as needed. Doc. 18-1 at 20–21; Doc. 18-2 at 14–15, 72.   Both telemetry techs and leads report to the nurse manager, while the nurse managers report to the nursing directors in their departments. Doc 18-2 at 14, 24.

## A.   Lead Vacancy

In August 2019, one of the team lead positions became vacant. Doc 18-1 at 23.   While vacant, the nurse manager, Natasha Kersh, a white woman, occasionally asked Moss, Patricia Jackson, and Mandi Fink, another telemetry tech, to work the lead position. Doc. 18-1 at 13, 15, 23; Doc. 18-2 at 119.   Moss filled in ten or eleven

---

[3] The record uses the terms "lead telemetry tech," "lead monitor tech," "monitor tech II," and "telemetry tech II" interchangeably.  All describe the same position. Doc. 18-2 at 5.

times and received no complaints about her performance. Doc. 18-1 at 23.  Although Kersh asked Jackson to fill in once, she could not. Doc. 18-2 at 17, 119.

Moss, Fink, and Greg Robbins, a white man, contacted Kersh about applying for the lead position. Doc. 18-2 at 119.  The former lead, a white woman, encouraged Jackson,[4] who was also a white woman, to apply for the position. Doc. 18-3 at 10. Jackson eventually mentioned to Kersh that she might be interested in the lead position. Doc. 18-3 at 10.  At some point, both the former lead and Kersh suggested that Jackson "ought to put in for the job" because it came with a five percent pay increase.[5] Doc. 18-3 at 10.

When the position posted, Moss and Robbins submitted applications. Doc. 18-2 at 119.  Kersh followed up with Jackson and Fink to ask whether they were still interested in the position. Doc. 18-2 at 89, 119.  Jackson said she was, so Kersh told her to apply. Doc. 18-2 at 89, 119.  After Jackson submitted her application, St. Vincent's determined that Moss, Jackson, and Robbins were qualified (Doc. 18-2 at 17) and selected them for the first round of interviews. Doc. 18-2 at 119; Doc. 18-1 at 24.

---

[4] Moss trained Jackson for four to six weeks when Jackson started working at St. Vincent's in August 2018. Doc. 18-3 at 9; Doc. 18-1 at 31.  Jackson was familiar with the job itself because she had a combined 30 years of experience in monitor tech positions and similar healthcare related roles, but Moss taught her how to use St. Vincent's computer system. Doc. 18-3 at 5-6, 9; Doc. 18-2 at 19, 31, 106.

[5] Moss argues that Jackson testified that she was not going to seek the position until "Kersh hand-picked and convinced Jackson to apply." Doc. 23 at 28.  This argument is not supported by Jackson's testimony.

Kersh led the first round of interviews. Doc. 18-1 at 14.  She asked three other white employees, Adam Byess, Casi Dubose, and Caitlyn Moore, to help her conduct interviews, take notes, and fill out score sheets. Doc. 18-2 at 106, 119; Doc. 18-1 at 27, 103–122; Doc. 19 at 8.  After the interviews, Kersh did not score the candidates. Doc. 18-1 at 112–114.  Dubose and Moore used a numerical scoring system and both scored Jackson the highest out of the three candidates. Doc. 18-1 at 103–108.  Byess scored Jackson higher than Robbins, but he did not participate in Moss' interview. Doc. 18-1 at 25, 109–111; Doc. 18-2 at 119.  The interviewers eliminated Robbins as a candidate and decided to conduct a second round of interviews with Moss and Jackson. Doc 18-2 at 119; Doc. 18-1 at 26.

After Jackson's first interview, she told Moss that she did not know how to answer some of the questions. Doc. 18-1 at 26.  Jackson also told Moss that Moss was the best person for the job. Doc. 18-1 at 26.  Both Moss and Jackson believed that Moss would ultimately be selected for the position based on her experience and seniority with St. Vincent's.[6] Doc. 18-3 at 11; Doc. 18-1 at 30.

Kersh again led the second round of interviews, but the panel consisted of three new interviewers: Bernia McCain, Kira Schnitker, and Susan Sanderson. Doc. 18-2 at 119; Doc. 18-1 at 28.  McCain is black, while Schnitker and Sanderson

---

[6] In addition to performing her own telemetry duties, Moss sat in on telemetry tech interviews and trained new telemetry techs. Doc. 18-1 at 17–18, 23, 30, 31.

are white. Doc. 18-1 at 27; Doc 18-2 at 106.  Before the interviews, Kersh explained to the panel and the candidates that she wanted a team lead who would recognize safety issues and report them to her in a timely manner. Doc. 18-2 at 119.  Kersh asked the candidates various questions, including one based on a hypothetical safety issue. Doc. 18-2 at 120.  Jackson responded that she would notify Kersh in the hypothetical situation. Doc. 18-2 at 120; Doc. 18-1 at 116.  On the other hand, Kersh noted on her score sheet that Moss had to be probed to reach that answer. Doc. 18-1 at 115; Doc. 18-2 at 120.  McCain and Sanderson both gave Jackson higher scores than Moss. Doc. 18-1 at 117–120; Doc. 19 at 9.  Schnittker did not assess numerical scores but ranked Jackson as her first choice. Doc. 18-1 at 121–22.

Kersh selected Jackson for the job and informed Moss of the decision. Doc. 18-1 at 28–29.  When Moss questioned the hire, Kersh told her that Jackson gave better answers to some of the interview questions. Doc. 18-1 at 29.

## B.    Discrimination Allegation and Internal Investigation

In October 2019, approximately one month after the decision, Moss emailed a letter complaining about the promotion decision to Penny Aldridge, the Director of Cardiovascular Service, and four other individuals in leadership positions at St. Vincent's. Doc. 18-1 at 33–34; Doc. 18-2 at 25.  Moss claimed Kersh discriminated against her in the promotion decision, but she did not explicitly mention race as the basis for discrimination. Doc 18-1 at 34; Doc. 18-2 at 88–89.

Human Resource Leads Caitlin Griffin and Ashley Thomas received a forwarded copy of the letter. Doc. 18-2 at 25.  Afterwards, Aldridge, Griffin, and Thomas investigated Moss' discrimination claim and asked Kersh to describe the selection process and provide her reasons for selecting Jackson. Doc. 18-1 at 34; Doc. 18-2 at 26.  Kersh explained that the lead does more than read cardiac rhythms. Doc. 18-2 at 120.  Instead, the position required someone who could communicate well with Kersh and other employees. Doc. 18-2 at 119; Doc. 18-1 at 27.  Kersh also said she was looking for a candidate who would report safety issues to her in a timely manner and who worked well with other employees. Doc. 18-2 at 119; Doc. 18-1 at 27.

Kersh reported that she believed Jackson better fit these qualifications. Doc. 18-2 at 120.  Kersh thought Jackson was more personable, and the interview panel preferred her. Doc. 18-2 at 120.  Jackson answered the hypothetical safety interview question adequately and had reported safety issues to Kersh in the past. Doc. 18-2 at 120.  Kersh explained that Jackson believed in and followed the policies and practices set in place in the monitor room, while Moss did not agree with some of these policies and did not follow them as precisely. Doc. 18-2 at 120.  Kersh admitted, however, that she knew Jackson would not be the popular decision among the employees because of Moss' extensive career with St. Vincent's and because Jackson was a rule follower who would report issues to Kersh. Doc. 18-2 at 120.

The investigators also inquired about the two candidates' performance evaluations from July 2018 to July 2019 because Moss' scores were higher than Jackson's scores. Doc. 18-2 at 27–28, 101.  Kerch had scored Moss at an average of 3.5 while Jackson's average score was a 3.0. Doc. 18-2 at 94, 99, 101.  Kersh explained Jackson's lower score by emphasizing that the evaluation was Jackson's first at St. Vincent's so she wanted to leave room for improvement. Doc. 18-2 at 101.  Additionally, while Moss was the best telemetry tech at rhythm interpretation, Kersh highlighted that the lead is "completely related to interpersonal skills" and how well the lead works with others. Doc. 18-2 at 101.  The investigators concluded that Moss' skill with rhythm interpretation explained her high evaluations. Doc. 18-2 at 29.

Thomas and Aldridge met with Moss at the conclusion of their investigation. Doc. 18-1 at 34; Doc. 18-2 at 30.  They explained to Moss that Jackson had reported safety issues in the past to Kersh and that Jackson was considered to be a better leader. Doc. 18-1 at 34–35; Doc. 18-2 at 125.  Moss told the investigators that she too had reported safety issues in the past and that she considers herself a leader without a title. Doc. 18-1 at 34, 37.  She also told them that Jackson told Moss after Jackson's interview that she was unable to answer some of the interview questions. Doc. 18-1 at 34.  Thomas responded that there was no right or wrong answer to the interview questions. Doc. 18-1 at 35.

## C.    EEOC Charge

Moss filed a charge of race discrimination with the EEOC in November 2019 and alleged that "a lesser-qualified Caucasian cardiac monitor tech" had been chosen for the lead position. Doc. 18-1 at 38, 132.  The EEOC notified St. Vincent's of the charge and its intent to conduct an investigation. Doc. 18-2 at 104.  When receiving a charge, St. Vincent's policy is to send the EEOC notice directly to its legal team. Doc. 18-2 at 10.  The legal team does not notify human resources representatives and other St Vincent's employees of the EEOC investigation unless they need additional information or documents. Doc. 18-2 at 11, 30.

After an investigation, the EEOC found there was reasonable cause to conclude that St. Vincent's discriminated against Moss due to her race. Doc. 18-2 at 111.  The EEOC explained that St. Vincent's defense that the "second interview panel unanimously selected Ms. Jackson based on her interview responses is not corroborated by the panelists who deny participating in a group discussion to select a candidate." Doc. 18-2 at 109.  The EEOC also noted Moss' higher performance review. Doc. 18-2 at 111.  Moss received her right to sue letter on June 18, 2020. Doc. 18-2 at 109-111.

## D.    Moss' Discipline

St. Vincent's has a progressive disciplinary system. Doc. 18-2 at 8.  The first step in the system is coaching and counseling. Doc. 18-2 at 9.  A coaching and

counseling notification will be disregarded after 12 months if the employee incurs no further infractions. Doc. 18-2 at 9.  The next step is a written reminder that will permanently remain in the employee's file. Doc. 18-2 at 9.  After a written reminder, another infraction automatically results in a decision-making leave ("DML"). Doc. 18-2 at 9.

During a DML, an employee is sent home from his or her shift and has up to three days to contemplate the conditions of their employment. Doc. 18-2 at 9.  The employee can resign voluntarily or can submit an action plan mapping out how the employee can be successful for the remainder of his or her employment. Doc. 18-2 at 9.  The employee may submit the action plan at any time during the three-day period and may return to work after the plan has been accepted. Doc. 18-2 at 9–10. After a DML, an infraction of any nature will result in separation from employment. Doc. 18 at 9–10.

In January 2020, approximately two months after Moss filed her discrimination charge with the EEOC, Moss failed to notice and report that a patient was off monitor.[7] Doc. 18-1 at 40–41; Doc. 18-2 at 102, 112–17.  Specifically, a patient being treated for chest pain with IV medications left against medical advice ("AMA"). Doc. 18-1 at 40.  Camera footage revealed that the patient was off monitor

---

[7] When a patient goes off monitor it means that the patient's vital signs are no longer being monitored.

for 22 minutes (Doc. 18-2 at 112), but Moss did not notice. Doc. 18-1 at 40.  When Moss later realized the patient was off monitor, she called the nursing department two times to report the patient. Doc. 18-2 at 112; *see also* Doc. 18-1 at 42.  After calling the nursing department, Moss left the monitor room to heat her food even though this was not in line with hospital rules for appropriate breaks.[8] Doc. 18-2 at 113.

Because Moss had a written reminder in 2017, this incident resulted in DML. Doc. 18-5 at 2.  Kalah Regis, a black woman who was the nurse manager at the time, issued the DML and supervised the DML process. Doc. 18-1 at 14, 39; Doc. 18-6 at 2–3.  Regis issued the DML because of Moss' delay in reporting the off-monitor status of the patient and for the timing of her break. Doc. 18-2 at 112–13.  She found that both infractions directly related to patient safety. Doc. 18-2 at 113.

After being placed on DML, Regis sent Moss home from work for the rest of the day, but did not suspend her pay. Doc. 18-1 at 42.  Consistent with the DML process, Moss submitted two corrective action plans but Regis rejected both. Doc. 18-1 at 42; Doc. 18-2 at 115.  Regis approved Moss' third corrective action plan and emailed Moss to tell her that she could return to work but would be on a

---

[8] Moss explained that she was not aware of the regulations related to appropriate break times and she needed to heat her food because she is diabetic. Doc 18-1 at 42.

90-day probationary period.[9] Doc 18-2 at 40, 118; Doc. 18-1 at 40, 42.   Moss

returned to work for her next shift. Doc. 18-1 at 42.

### III.  DISCUSSION

Moss brings two claims against St. Vincent's: (1) race discrimination in

violation of Title VII and § 1981 and (2) retaliation in violation of Title VII and

§ 1981. Doc. 1 at 5–11.  St. Vincent's moves for summary judgment on both claims.

Doc. 19.  For the following reasons, summary judgment is due to be granted on all

claims.

### A.    Race Discrimination in Violation of Title VII and § 1981[10]

Under Title VII and § 1981, "it [is] unlawful for an employer 'to fail or refuse

to hire or to discharge any individual, or otherwise to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national

origin.'" *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1288 (11th Cir. 2003) (quoting

42 U.S.C. § 2000e–2(a)(1)).  Absent direct evidence of discrimination, a plaintiff

---

[9] It is not in St. Vincent's written policy to place employees on a "probationary period" after DML.
Doc. 18-2 at 9.  Instead, the policy states that employees previously placed on DML will be
terminated if they incur any additional infractions while employed with St. Vincent's. Doc. 18-2
at 9.

[10] Because Title VII and § 1981 have the same requirements of proof and use the same analytical
framework, *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998), the court
addresses the Title VII claims with the understanding that the analysis applies equally to the
§ 1981 claims. *See Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 843 n.11 (11th Cir. 2000)
(stating that race discrimination claims under § 1981 and Title VII need not be analyzed separately
because the elements of the claims are the same).

may prove her case through circumstantial evidence using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Wilson v. B/E Aerospace, Inc*., 376 F.3d 1079, 1087 (11th Cir. 2004). The plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Id*. After the *prima facie* case, the employer has the burden to articulate a legitimate, nondiscriminatory reason for the employment decision. *Id*. As long as the employer articulates "a clear and reasonably specific" non-discriminatory basis for its actions, it has discharged its burden of production at this stage. *Tex. Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981).

After an employer articulates one or more legitimate, non-discriminatory reasons for the employment action, the plaintiff must show that the proffered reason was a pretext for illegal discrimination. *Id*. If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must "meet that reason head on and rebut it." *Chapman v. AI Transp*., 229 F.3d 1012, 1030 (11th Cir. 2000). Although the burden of production may shift, the ultimate burden of persuasion remains with the plaintiff. *E.E.O.C. v. Joe's Stone Crabs, Inc*., 296 F.3d 1265, 1272 (11th Cir. 2002).

The *McDonnell Douglas* framework is not the only way for a plaintiff to survive summary judgment in a discrimination case. *See Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Rather, "[t]he plaintiff will always

survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id*. A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker. *Id*.; *see generally Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012). Moss attempts to establish discrimination using both methods of proof.

### 1.   McDonnell Douglas *Framework*

Moss contends that she suffered racial discrimination when she was not selected for the lead position. In the context of a failure-to-promote claim, the plaintiff must meet four elements to make out a *prima facie* case: (1) she is a member of a protected class; (2) she applied for, and was qualified to fill, a position for which the defendant was accepting applications; (3) she did not receive the position despite her qualifications; and (4) after her rejection, the employer either kept the position open or filled it with a person outside of plaintiff's protected class. *See Vessels v. Atlanta Indep. Sch. Sys.,* 408 F.3d 763, 768 (11th Cir. 2005). A plaintiff does not need to introduce evidence of the relative qualifications of the promoted person to prove her *prima facie* case. *Walker v. Mortham*, 158 F.3d 1177, 1193 (11th Cir.

1998).[11]

Moss has established a *prima facie* case of discrimination.  She is a member of a protected class, applied for the promotion and was rejected despite her qualifications, and the position was filled by a person outside of her class. Doc. 23-1 at 1–2.   The burden thus shifts to St. Vincent's to provide a legitimate, nondiscriminatory reason for promoting Jackson over Moss. *See Lewis*, 918 F.3d at 1221.

St. Vincent's has met its burden of production.  Kersh based the promotion decision on the interview process and her personal experience working with both Moss and Jackson.  Kersh explained that she believed Jackson would promptly and reliably report safety issues and do what was asked of her even if she disagreed with

---

[11] In *Brown v. Alabama Department of Transportation*, 597 F.3d 1160, 1174 (11th Cir. 2010), the Eleventh Circuit stated that "[i]n the failure-to-promote context, the *prima facie* case consists of showing these elements: (1) that the plaintiff belongs to a protected class; (2) that she applied for and was qualified for a promotion; (3) that she was rejected despite her qualifications; and (4) that other equally or less-qualified employees outside her class were promoted."  Previously, however, the court had explicitly held in *Walker*, 158 F.3d at 1193, that a district court "erred in imposing as part of the *prima facie* case a requirement that each plaintiff establish that the successful applicant for his or her coveted position was less than or equally qualified to hold the position." *Brown* did not overrule—or even explicitly address—*Walker*.  As a result, arguably the law is unsettled as to whether a plaintiff bears the burden of proving, at the *prima facie* stage, that the other employee was equally or less qualified. *See Johnson v. AutoZone, Inc.*, 768 F. Supp. 2d 1124, 1144 n.129 (N.D. Ala. 2011) (engaging in a detailed discussion of the issue and citing *Walker* for the proposition that "the plaintiff need not introduce evidence regarding relative qualifications" at the *prima facie* stage).  Until further guidance from the Eleventh Circuit, this court will join a number of its sister courts in requiring proof of only the first three factors articulated in *Brown*. *See, e.g.*, *White v. Crystal Mover Servs., Inc.*, 2014 WL 4662371, at *28–29 (N.D. Ga. June 24, 2014); *Ezell v. Darr*, 951 F. Supp. 2d 1316, 1331 n. 11 (M.D. Ga. 2013); *Houston v. Town of Palm Beach Shores*, 2012 WL 5903809, at * 4–5 (S. D. Fla. Nov. 26, 2012); *Johnson*, 768 F. Supp. 2d at 1144 n.129.

the directive. Doc. 18-2 at 119–120.  Additionally, every panelist in the second round of interviews rated Jackson higher than Moss. Doc. 18-1 at 115–22.

The burden thus shifts back to Moss to produce sufficient evidence to permit a reasonable factfinder to find that St. Vincent's reasons for not promoting her were pretextual. *See Burdine*, 450 U.S. at 253.  Moss can meet this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id*. at 256; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).  And she can show that the proffered explanation is unworthy of credence by revealing weaknesses, inconsistencies, or contradictions in the explanation. *Combs*, 106 F.3d at 1538.

The federal courts, however, are not "in the business of adjudging whether employment decisions are prudent or fair." *Damon v. Fleming Supermarkets of Fla., Inc.*,196 F.3d 1354, 1361 (11th Cir. 1999).  Therefore, if the proffered reason is one that might have motivated a reasonable employer, the employee "must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030.  And "when a plaintiff chooses to attack the veracity of the employer's proffered reason, the inquiry is limited to whether the employer gave an honest explanation of its behavior." *Krager v. Takeda Pharma. Am.*, 702 F.3d 1304, 1310 (11th Cir. 2012).  Even if an

employer's proffered reason is false, "[a] reason is not pretext for discrimination unless it is shown both that the reason was false and that discrimination was the real reason." *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006) (emphasis, citation, and quotation marks omitted).

Moreover, a plaintiff cannot prove pretext by showing merely that she was better qualified. *Springer*, 509 F.3d at 1349. She must show that the "defendant's employment decisions . . . were in fact motivated by race." *Id.* The inquiry into pretext is based on "the employer's beliefs, and not the employee's own perceptions of his performance." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997). As the Eleventh Circuit explained, "to be blunt about it," the inquiry does not center "on reality as it exists outside of the decision maker's head." *Alvarez*, 610 F.3d at 1266 (explaining that the question is not whether the employee actually had performance problems but "whether her employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those complaints . . . as cover for" discrimination).

Moss' pretext arguments fail. She attempts to discredit St. Vincent's stated reasons for the decision by pointing to numerous alleged discrepancies (Doc. 23 at 27–31), but her attacks fall short. None of Moss' arguments establish that Kersh's stated reasons for the decision were false and that race discrimination was the real reason for not promoting her. *See Brooks*, 446 F.3d at 1163. For example, Moss

18

highlights her safety accolades, statements made by Kersh in her performance evaluation,[12] and the fact that she trained Jackson (Doc. 23 at 28–30, 31–32), but this evidence does not show that Kersh did not honestly believe that Jackson would communicate with her better than Moss on safety issues or that Jackson would do what was asked of her even if she disagreed with it.  Moss' pretext argument amounts to a simple disagreement with Kersh.  This is not enough to establish pretext. *Chapman*, 229 F.3d at 1030.

Equally unavailing is Moss' argument about the EEOC's cause determination. Moss contends that the "EEOC's investigation directly contradicts St. Vincent's contention that the panelists unanimously rated Jackson higher than Moss." Doc. 23 at 27.  The court disagrees.  The EEOC determination states that St. Vincent's "defense that the second interview panel unanimously selected Jackson . . . is not corroborated by the panelists, who deny participating in a group discussion to select a candidate. . . . Instead, the evidence shows that the sole decision-maker Natasha Kersh" made the decision to select Jackson for the promotion. Doc. 18-2 at 109.

Regardless of St. Vincent's defense at the EEOC level, the court "is not required to defer or make reference to the EEOC determination in its opinion deciding summary judgment." *Keaton v. Cobb County*, 545 F. Supp. 2d 1275, 1310–

---

[12] Moss makes much of Kersh's statement in her performance evaluation that Moss "works to make sure those standards are upheld to prevent safety related issues." Doc. 23 at 31–32.  Kersh, however, did not base her decision on a lack of expertise or a perception that Moss did not safely perform her job.

11 (N.D. Ga. 2007) (internal citation omitted). "It is the [c]ourt's, not the EEOC investigator's, duty to determine whether issues of material fact exist." *Id.* at 1311 (internal citation omitted). Moreover, here, the findings and determination of the EEOC are not supported by the evidence in the record at summary judgment. *See, e.g.*, *Alexander v. Baldwin County Bd. of Educ.*, 2008 WL 3551194, at *8 n.14 (S.D. Ala. Aug.12, 2008) (finding that the EEOC determination did not create an inference of pretext when its conclusions were not supported by the summary judgment evidence). The evidence establishes that Kersh made the decision to promote Jackson and not Moss. In doing so, Kerch considered the overall rankings by the panelists, but their rankings were not the basis for the promotion decision.

Finally, Moss argues that St. Vincent's reasons for selecting Jackson are pretextual because she was better qualified than Jackson. Doc. 23 at 26; Doc. 18-1 at 39. This argument also fails. For a plaintiff to prove pretext by showing superior qualifications, the "disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Lee v. GTE Florida*, 226 F.3d 1249, 1254 (11th Cir. 2000). Moss cannot meet this high standard.

Although Moss was highly skilled and respected for her ability to read cardiac rhythms as a telemetry tech, her qualifications for the lead position are not so

superior that no reasonable person could have chosen Jackson over her.  Jackson also had an extensive career in healthcare, including approximately 30 years as a monitor tech or in similar healthcare roles. Doc. 18-2 at 106.  But ultimately the promotion decision was not rooted in the candidates' skills as telemetry technicians. Instead, Kersh made the decision because of her belief that Jackson would communicate better and more frequently and would do what was asked even if she disagreed with it.  Additionally, neither Moss' longer tenure at St. Vincent's nor the fact that she trained Jackson on the computer system when Jackson first joined St. Vincent's prove that she was more qualified for the lead position.  Simply put, Moss has not presented evidence that her qualifications were so superior that no reasonable person would promote Jackson over her.

### 2.    *Convincing Mosaic*

Moss also contends that her "disparate treatment claim advances under the convincing mosaic standard because she has produced sufficient circumstantial evidence of discriminatory intent." Doc. 23 at 33.  Moss does not paint this mosaic for the court, but instead points to her pretext arguments.  The evidence before the court, however, does not create a triable issue as to St. Vincent's discriminatory intent.  Instead, Moss' proof of racial discrimination boils down to this testimony: "I was the most qualified person . . . , and I was black and [Jackson] was white and it wasn't anything else. . . . It had to be because of my race, because I had done

everything that I needed to do." Doc. 18-1 at 39.  Moss has not offered any support for her conclusion other than her own personal opinion about her qualifications. "Speculation does not create a genuine issue of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (citation omitted).

Ultimately, it is not the court's job to decide whether an employment decision is fair or wise, but only whether it is legal. *See Damon*, 196 F.3d at 1361.  To succeed, Moss must show "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the St. Vincent's rationale. *Combs*, 106 F.3d at 1538.  Moss has failed to do so.  Therefore, summary judgment is due to be granted on Moss' Title VII and § 1981 race discrimination claims.

## B.    Retaliation

Title VII protects an employee from retaliation by her employer because she (a) opposed any practice prohibited by Title VII or (b) participated in any manner in an investigation, proceeding, or hearing under Title VII. *See* 42 U.S.C. § 2000e-3(a); *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000).  While 42 U.S.C. § 1981 does not expressly protect individuals from retaliation, courts have extended the statute to cover retaliatory conduct. *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 451–52 (2008); *Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1412–13 (11th Cir. 1998).  The elements of claims for retaliation under § 1981 and Title VII are the same and therefore need not be analyzed independently. *See Butler*

*v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1212–13 (11th Cir. 2008).

Moss contends St. Vincent's retaliated against her when it placed her on DML in January 2020, two months after she filed her EEOC charge. Doc. 23 at 24.  The *McDonnell Douglas* burden-shifting framework governs retaliation claims based on circumstantial evidence. *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162–63 (11th Cir. 1993).  To establish a *prima facie* case of retaliation under Title VII, Moss must show that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal relationship between the two events. *Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1363 (11th Cir. 2007).  If she demonstrates a *prima facie* case of retaliation, the burden shifts to St. Vincent's to show a non-retaliatory reason for the adverse employment action. *See id*.  If it succeeds, Moss must satisfy the "but for" test pronounced in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013). *See Tolar v. Bradley Arant Boult Cummings, LLP*, 997 F.3d 1280, 1294 (11th Cir. 2021) (citation omitted).  "That is, the plaintiff must show that, based on the evidence, one could reasonably infer that but for her protected conduct the employer would not have taken the alleged adverse action." *Id*.

St. Vincent's contends that Moss cannot establish the third element of her *prima facie* case.  To prove a causal connection at the *prima facie* stage, a plaintiff must show two things.  First, she must demonstrate that "the decisionmaker actually

23

knew about the employee's protected expression." *Martin v. Fin. Asset Mgmt. Sys.*, 959 F.3d 1048, 1053 (11th Cir. 2020).  The knowledge "requirement rests upon common sense.  A decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart v. BellSouth Telecomms., Inc*., 231 F.3d 791, 799 (11th Cir. 2000).  Therefore, "unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct" generally extinguishes any causal connection between the protected activity and the adverse employment action. *Id*.; *see also Bass v. Bd. of County Comm'rs, Orange County, Fla*., 256 F.3d 1095, 1119 (11th Cir. 2001), *overruled in part on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008) ("It is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware of the protected expression.").  Second, Moss must demonstrate that "the protected activity and the adverse action were not wholly unrelated." *Tolar*, 997 F.3d at 1294 (citation and quotation marks omitted).  This standard is met where there is "close temporal proximity" between the statutorily protected activity and the adverse action; however, absent other evidence of causation, the temporal proximity "must be very close." *Id*. (citation and quotation marks omitted).  When close temporal proximity is lacking, a plaintiff can show causation "where intervening retaliatory acts commenced shortly after the plaintiff engaged in a protected activity." *Boyland v.*

24

*Corrs. Corp. of Am.*, 390 F. App'x 973, 974–75 (11th Cir. 2010).

Moss has not presented evidence sufficient to establish causation.  Regis, the decisionmaker, testified in her declaration that "[a]t no point—either prior to or at the time I made the decision to issue Ms. Moss a Corrective Action—was I aware of any EEOC charge or other complaints of discrimination from Ms. Moss." Doc. 18-6 at 3–4.  She further testified that she never had a conversation with Moss "that [Moss] thought she was being treated differently because of her race" and during her supervision of Moss she never heard "about or otherwise become aware that Ms. Moss had made any internal complaint that she was being treated differently because of her race." Doc. 18-6 at 4.

In the face of this evidence, Moss argues that Regis knew about the EEOC charge and internal complaints "because everybody knew," but she admits she did not explicitly tell Regis about her EEOC charge. Doc. 18-1 at 39.  Moss instead points to a conversation with Regis around the time when Regis placed her on DML.  Specifically, Moss said to Regis, "I know you know what is going on," and Regis replied, "yeah." Doc. 18-1 at 39.  Considering Regis' denial of knowledge of the EEOC charge, such a cryptic conversation is insufficient to create a question of fact as to whether Regis was aware of Moss' protected activity.  Mere suspicion that Regis had knowledge of her discrimination complaint is inadequate. *Martin v. Fin. Asset Mgmt. Sys.*, 959 F.3d 1048, 1053 (11th Cir. 2020) (concluding that a

decisionmaker's awareness of an EEOC charge cannot be established by "unsupported inference"). "[U]nsupported speculation does not meet a party's burden of producing some defense to a summary judgment motion." *Cordoba*, 419 F.3d at 1181 (alterations adopted and citation omitted). Without evidence that Regis knew of her protected activity, Moss' retaliation claim fails. Therefore, summary judgment is due to be granted on her retaliation claim.

Even if Moss could meet her *prima facie* burden, she has not shown that St. Vincent's legitimate non-retaliatory reason for her discipline was a pretext for retaliation. Moss admits the error that led to the DML. She testified that she "didn't see it" when her patient went AMA. Doc. 18-1 at 40. She explained that she "didn't prolong the mistake, [and] when [she] saw the patient was off, [she] called and reported it," but this late reporting does not excuse her failure to notice and report a patient who was off monitor for 22 minutes, partially because she left the monitor room to heat her lunch.[13] Moss testified that Regis could have issued a coaching and counseling disciplinary notice for this infraction (Doc. 18-1 at 40), but it is undisputed that DML was the next step in St. Vincent's progressive disciplinary policy because of Moss' previous written reminder. Doc. 18-2 at 112; Doc. 18-5 at 3. "An employer's stated reason is not a pretext unless it is shown that both: (1) the

---

[13] Moss' attempt to recast the reason for her discipline fails. *See* Doc. 18-1 at 40. Regis did not discipline Moss because the patient went AMA. Instead, the stated reason was her failure to timely report it.

reason was false; and (2) the real reason was unlawful." *Burback v. BNSF Ry. Co.*, 963 F. Supp. 2d 1255, 1262–63 (N.D. Ala. 2013) (citing *St. Mary's Honor Ctr.*, 509 U.S. at 515).  Moss' admission thus is fatal to her retaliation claim.

Moss likewise fails in her attempt to rely on comparator evidence to show that St. Vincent's reasons are pretextual.  A pretext showing may be met with proof of an employer's differential treatment of employees who were similarly situated in all material respects. *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1227 (11th Cir. 2019).  This does not require the plaintiff and her comparator to be identical except for race, nor must they have the same job title. *Id.* (citing *Lathem v. Dept. of Child. & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) ("The relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies.")).  Instead, a similarly situated comparator and the plaintiff will ordinarily (1) have engaged in the same basic conduct; (2) have been subject to the same employment policy, guideline, or rule; (3) ordinarily (although not always) have been under the jurisdiction of the same supervisor; and (4) share a similar employment or disciplinary history. *Lewis*, 918 F.3d at 1227–28. The "all-material-respects standard serves the interest of sound judicial administration by allowing for summary judgment in appropriate cases—namely, where the comparators are simply too dissimilar to permit a valid inference that invidious discrimination is afoot." *Id.* at 1229.

Here, Moss contends that two white telemetry techs, Joe Zazoda and Johnny Carter, engaged in similar conduct but were treated more favorably. Doc. 18-1 at 41; Doc. 23 at 35.  Moss' deposition testimony and declaration supply the only evidence relating to these two alleged comparators.  Moss testified that Zazoda "had a patient code and he didn't lose his job." Doc. 23-1 at 11; *see also* Doc. 18-1 at 41.  Putting aside whether "having a patient code" is similar conduct to neglecting a patient who was off his monitor for more than 20 minutes, Moss and Zazoda were treated materially similarly in that neither lost their jobs.  And there is no evidence in the record reflecting whether Zazoda had been disciplined in the past.  Similarly, although Moss states that Carter "had a patient code and he was transferred" (Doc. 23-1 at 11), the record contains no further details on Carter's discipline history or the incident for which he was disciplined.  Because these pretext arguments fail, summary judgment is due to be granted on Moss' retaliation claims.

## IV.  CONCLUSION

For these reasons, St. Vincent's Motion for Summary Judgment (Doc. 27) is due to be granted.  A separate final order will be entered.

DONE and ORDERED on October 25, 2022.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE

28